UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x
INDIANA PUBLIC RETIREMENT SYSTEM, :
on Behalf of Itself and All Others Similarly :
Situated, :
　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　　　　 Plaintiff, :
　　　　　　　　　　　　　　　　　　 :
　　　vs. :
　　　　　　　　　　　　　　　　　　 :
AGILON HEALTH, INC., STEVEN J. SELL, :
TIMOTHY S. BENSLEY, GLENN :
SOBOTKA, MICHELLE A. GOURDINE, :
MICHAEL L. SMITH, RONALD A. :
WILLIAMS, SHARAD MANSUKANI, :
CLAY RICHARDS, RAVI SACHDEV, :
RICHARD J. SCHNALL, DEREK L. :
STRUM, WILLIAM WULF, CLAYTON, :
DUBILIER & RICE, LLC, GOLDMAN :
SACHS & CO. LLC, J.P. MORGAN :
SECURITIES LLC, and BofA SECURITIES, :
INC., :
　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　　　　 Defendants. :
————————————————————— x

Civil Action No.  1:24-cv-02506

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff Indiana Public Retirement System ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of agilon health, inc. ("Agilon" or the "Company"), the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased shares of Agilon common stock between April 15, 2021 and February 27, 2024, both dates inclusive (the "Class Period"), including purchases traceable to the April 2021 initial public offering of Agilon stock (the "IPO"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") and the Securities Act of 1933 (the "1933 Act") against Agilon, certain of the Company's senior officers and directors, the underwriters for the IPO, and private equity owner of the Company.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o, §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act, 15 U.S.C. §77(v), and §27 of the 1934 Act, 15 U.S.C. §78aa.

3.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and §27 of the 1934 Act and §22 of the 1933 Act, because several defendants are headquartered in this District, the IPO was conducted in this District, Agilon stock trades in this District, and the statements alleged to be actionable herein were disseminated into this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

5.      Plaintiff Indiana Public Retirement System, as set forth in the certification attached hereto and incorporated by reference herein, purchased Agilon common stock during the Class Period and traceable to the IPO and suffered damages as a result.

6.      Defendant Agilon is a healthcare company.  Agilon stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "AGL."

7.      Defendant Steven J. Sell ("Sell") was the Chief Executive Officer ("CEO"), the President, and a director of Agilon during the Class Period.

8.      Defendant Timothy S. Bensley ("Bensley") was the Chief Financial Officer ("CFO") of Agilon during the Class Period.  Agilon announced Bensley's abrupt retirement at the end of the Class Period.

9.      The defendants referenced in ¶¶7-8 above are collectively referred to herein as the "1934 Act Individual Defendants."  Each of the 1934 Act Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as

- 2 -

alleged herein.  In addition, the 1934 Act Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein and approved or ratified these statements, in violation of the federal securities laws.

10.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, the 1934 Act Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects.  In addition, the 1934 Act Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information.  These defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

11.     Defendant Glenn Sobotka ("Sobotka") served as the Chief Accounting Officer ("CAO") of the Company at the time of the IPO.

12.     Defendant Michelle A. Gourdine ("Gourdine") served as a director of the Company at the time of the IPO.

13.     Defendant Michael L. Smith ("Smith") served as a director of the Company at the time of the IPO.

14.     Defendant Ronald A. Williams ("Williams") served as a director of the Company at the time of the IPO.

15.     Defendant Sharad Mansukani ("Mansukani") served as a director of the Company at the time of the IPO.

16.     Defendant Clay Richards ("Richards") served as a director of the Company at the time of the IPO.

17.     Defendant Ravi Sachdev ("Sachdev") served as a director of the Company at the time of the IPO.

18.     Defendant Richard J. Schnall ("Schnall") served as a director of the Company at the time of the IPO.

19.     Defendant Derek L. Strum ("Strum") served as a director of the Company at the time of the IPO.

20.     Defendant William Wulf ("Wulf") served as a director of the Company at the time of the IPO.

21.     The defendants referenced in ¶¶11-20 above, together with the 1934 Act Individual Defendants, are collectively referred to herein as the "1933 Act Individual Defendants."  Each of the 1933 Act Individual Defendants signed the registration statement for the IPO and solicited investors and otherwise participated in the IPO for their own financial benefit and/or the financial benefit of Agilon and defendant Clayton, Dubilier & Rice, LLC.

22.     Defendant Clayton, Dubilier & Rice, LLC ("CD&R") is a private equity firm headquartered in New York, New York.  CD&R served as the controlling shareholder of Agilon during the Class Period and the owner of Agilon stock sold in the September 2021 secondary offering of Agilon stock (the "September 2021 SPO") and the May 2023 secondary offering of Agilon stock (the "May 2023 SPO").  CD&R created Agilon through a merger of two healthcare businesses and then took the Company public in the IPO.

23.     Agilon hired defendants Sell and Bensley prior to the IPO while it was privately owned by CD&R.  In addition to appointing the Company's management, CD&R designated

numerous members of Agilon's Board of Directors (the "Board"), each of whom was affiliated with CD&R, including defendant Williams, who served as the Chairman of the Board, and defendants Sachdev, Schnall, and Strum.  At the time of the IPO, CD&R owned 69% of Agilon stock and caused the Company to enter into a variety of agreements preferential to its interests, including a stockholder's agreement, an indemnification agreement, a credit facility agreement, and a registration rights agreement which, among other things, granted CD&R special access rights to Company information and guaranteed that CD&R would appoint the Chairman of the Board so long as it owned at least 25% of Agilon's outstanding common stock.  At the time of the May 2023 SPO, CD&R still owned 47% of Agilon's outstanding common stock and, because of its relationship with the Company and Agilon management and the agreements and course of dealings it had with the Company and its management, exercised actual control over the Company, including with respect to the decision to conduct the September 2021 SPO and the May 2023 SPO. In the September 2021 SPO, CD&R sold over 17 million Agilon shares at $30 per share, reaping nearly $520 million in sale proceeds net of underwriting discounts and commissions.  In the May 2023 SPO, CD&R sold over 94 million Agilon shares at $21.50 per share, reaping nearly $2 billion in sale proceeds net of underwriting discounts and commissions.

24.     Defendants Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, and BofA Securities, Inc. are referred to herein as the "Underwriter Defendants."  The Underwriter Defendants are all investment banking houses headquartered in New York, New York.  The Underwriter Defendants served as lead underwriters and underwriter representatives for the IPO. The Underwriter Defendants purported to conduct a due diligence investigation in connection with the IPO and gained access to information regarding the Company, its business, operations, financial results, and prospects.  The Underwriter Defendants solicited investors and otherwise

participated in the IPO for their own financial benefit, sharing, together with other underwriters for the IPO, over $61 million in underwriting discounts and commissions for the IPO, which included a full exercise of the underwriters' overallotment option.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased Agilon common stock during the Class Period, including purchases traceable to the IPO (the "Class").  Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

26.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Agilon common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Agilon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

27.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

28.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the registration statement for the IPO was materially false and misleading;

(b)     whether defendants' statements during the Class Period were materially false and misleading;

(c)     for the 1934 Act allegations only, whether defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(d)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

31.     In July 2016, CD&R created Agilon through the completion of two healthcare acquisitions, which it then merged: (i) Primary Provider Management Company, Inc., which operated in Southern California; and (ii) Cyber-Pro Systems, Inc., which operated in Hawaii.  After the California Department of Managed Health Care found the Company to have engaged in noncompliant practices with respect to claims and utilization management, Agilon divested its California operations, an event completed in February 2021.  In April 2021, Agilon entered into a physician partnership with Central Ohio Primary Care Physicians, Inc., a physician-owned medical

- 7 -

group, to establish a Medicare-centric, globally capitated line of business in the Columbus, Ohio region.  Since that time, Agilon expanded and entered into new partnerships in Austin, Akron, Pittsburgh, North Carolina, Hartford, Buffalo, Toledo, Dayton, and Southeast Ohio.

32.     Agilon operates healthcare networks of primary care physicians ("PCPs") across these various regional geographies.  The Company forms risk-bearing entities ("RBEs") within local geographies that enter into global capitation arrangements with payors, which include national healthcare plans such as Medicare and insurance companies, providing for monthly payments to manage the total healthcare needs of the Company's physician partners' attributed patients.  Agilon then contracts with the PCPs in its networks pursuant to which the physician groups receive a base compensation rate and a share in the savings from successfully improving the quality of care for patients and reducing costs.

33.     Agilon and its physician groups share in any profits derived from unspent capitation payments, which theoretically should encourage more value-based healthcare and preventive measures as compared to the fee-for-service model used in most healthcare settings, which has been criticized as encouraging excessive medical interventions and treatments.  Although Agilon splits potential profits with its physician partners, the Company generally accepts the full financial risk for patients attributed to Agilon through its contracted PCPs and is financially liable for all healthcare services required by those patients.  Thus, Agilon effectively acts as a middleman between payors and healthcare providers, with payors able to retain a portion of premium payments, such as those received from the Centers for Medicare & Medicaid Services ("CMS"), while transferring the risk of financial loss to Agilon, and PCPs able to receive guaranteed compensation with an additional financial incentive to treat their patients in a more holistic fashion.

34.     Because of the transfer of financial risk to Agilon, it is critically important to investors that Agilon accurately track and report medical claims and utilization rates.  If the total cost to provide medical services to Agilon's members exceeds the corresponding amount of revenue received by the Company for those members, Agilon would suffer negative cash flows. Any significant increase in the need for medical services by Agilon's patient population could have a devastating effect on the Company's finances and profitability and potentially undermine the Company's entire business model and investment proposition.  One of the most important metrics for tracking Agilon's profitability is its medical margin, which represents the amount earned from medical services revenue after medical services expenses are deducted.  As Agilon has acknowledged, the Company's "profitability depends to a significant degree on [its] ability to accurately predict and effectively manage [its] medical margin, through improving healthcare quality and effectively managing costs."

35.     The centerpiece of Agilon's business is its "Total Care Model," which focuses exclusively on Medicare in partnership with community-based physician groups and involves subscription-like per member per month ("PMPM") arrangements with health plans or directly with the government.  Agilon states that its Total Care Model is powered by a proprietary platform that, among other things, allows the Company to closely track "millions" of patient data records each month, employ sophisticated analytics, and operationalize the finance elements of a risk-bearing structure.  Although the Company has historically operated at a net loss, Agilon stated that its Total Care Model would allow the Company to grow membership and profitability over time as new physician groups matured and as a result of the structural characteristics inherent in the Company's long-term partnerships and the nature of the Medicare Advantage economic model.

36.     CD&R took Agilon public in April 2021.  From the Company's founding to the IPO, Agilon stated that it had exported its Total Care Model from 1 to 17 geographies and grown its patient base from approximately 24,000 patients to 210,000 Medicare Advantage members on its platform.  At the same time, Agilon claimed that its medical margins had dramatically improved for its physician groups as those physician groups matured on the Company's network and platform.  For example, Agilon stated that the compound annual growth rate ("CAGR") for its membership in one geography was 20%, while its medical margin PMPM CAGR for that same geography was 169% over the same three-year period, indicating substantially improved profitability.  As Agilon stated in its IPO prospectus: "We believe medical margin rates within any geography will continue to increase over the course of our long-term partnerships, as cohorts of members within the geography are on our platform for longer periods of time."

37.     Following the IPO, Agilon claimed to have achieved remarkable revenue and medical margin growth, apparently confirming the unique advantages of the Company's care-focused business model.  For its fiscal 2022, Agilon stated it had achieved total revenue of $2.71 billion, a 48% increase compared to $1.83 billion achieved in fiscal 2021.  The Company also claimed its medical margins had grown even more quickly during the year, improving to $305 million for 2022, a 67% increase over the $182 million medical margin achieved in 2021.  Meanwhile, the Company stated its net losses for the year had fallen to $107 million, compared to a net loss of $407 million in 2021, while its adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") had swung from negative $39 million in 2021 to positive $4 million in 2022.

38.     Throughout the Class Period, defendants claimed that Agilon's differentiated business model had allowed it to avoid an uptick in utilizations and medical care costs affecting

other medical providers and that the comparably better outcomes achieved by Agilon validated the success of its Total Care Model.  Even as other healthcare providers reported upticks in utilizations, defendants denied that Agilon was suffering from these same adverse trends and pointed to the Company's purportedly superior cost mitigation track record as evidence of its competitive advantages.  These representations caused the price of Agilon stock to increase to over $40 per share.  During the Class Period, defendants sold billions of dollars' worth of Agilon stock at inflated prices, including in three registered stock offerings during the Class Period as detailed herein.

39.     Unbeknownst to investors, in reality Agilon's business model did not offer the cost savings represented by defendants, and the Company was suffering the same dramatic uptick in utilizations and medical claims as other healthcare providers, as patients who had delayed elective procedures and otherwise utilizing medical benefits during the COVID-19 pandemic sought treatment.  Agilon was experiencing up to 3x higher costs in 2023 as compared to 2022 and had suffered tens of millions of dollars in excessive costs not revealed to investors, including costs related to supplemental benefits, specialist costs, outpatient surgeries, and Part B drugs.  In addition, Agilon had failed to disclose tens of millions of dollars' worth of adverse prior year development claims.  As a result, Agilon was running ***hundreds of millions of dollars*** below the medical margin trend represented to investors, with drastic implications for the Company's profitability, its ability to achieve positive cash flows, and the viability of its business model.

40.     After the truth was revealed, the price of Agilon stock collapsed to $6 per share, more than ***85% below*** the Class Period high.

**MATERIALLY FALSE AND MISLEADING STATEMENTS AND
OMISSIONS IN THE REGISTRATION STATEMENT**

41.     On March 18, 2021, Agilon filed with the SEC a registration statement for the IPO

on Form S-1, which was declared effective on April 14, 2021 (the "Registration Statement").  On

April 16, 2021, Agilon filed with the SEC a prospectus for the IPO on Form 424B4, which

incorporated and formed part of the Registration Statement (the "Prospectus").  In the IPO, Agilon

sold over 53 million shares of Agilon stock at $23 per share (which included the full exercise of

the underwriters' overallotment option), for over $1.2 billion in gross offering proceeds.

42.     The Registration Statement contained untrue statements of material fact, omitted

material facts necessary to make the statements contained therein not misleading, and failed to

make adequate disclosures required under the rules and regulations governing the preparation of

such documents.

43.     Specifically, the Registration Statement claimed that Agilon's differentiated

business model was "transforming healthcare by empowering [PCPs] to be the agents for change

in the communities they serve."  The Registration Statement represented that PCPs, in turn, were

"best positioned to drive meaningful change in quality, cost and patient experience when provided

with the right infrastructure and payment model."  The Registration Statement further stated that

Agilon provided such a model, which it described as reducing costs in pertinent part as follows:

> Through our combination of the agilon platform, a long-term partnership model
> with existing physician groups and a growing network of like-minded physicians,
> we are poised to revolutionize healthcare for seniors across communities
> throughout the United States.  Our purpose-built model provides the necessary
> capabilities, capital, and business model for existing physician groups to create a
> Medicare-centric, globally capitated line of business.  Our model operates by
> forming RBEs within local geographies, that enter into arrangements with payors
> providing for monthly payments to manage the total healthcare needs of our
> physician partners' attributed patients (or global capitation arrangements), contract
> with agilon to perform certain functions and enter into long-term professional
> service agreements with one or more anchor physician groups pursuant to which

the anchor physician groups receive a base compensation rate and share in the savings from ***successfully improving quality of care and reducing costs***.

44.     The Registration Statement further represented that Agilon's "business model is differentiated by its focus on existing community-based physician groups and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network."   The Registration Statement claimed that the Agilon platform provided robust data integration which "improve[d] quality of care, cost and patient and physician experience" and "reduce[d] medically unnecessary drivers of healthcare costs."  The Registration Statement continued: "As earnings are generated at the local level due to improvements in quality of care and management of healthcare costs, we share those earnings with our anchor physician groups," which purportedly created a "Flywheel Effect," which "generates improving quality and cost outcomes."

45.     The Registration Statement further stated that Agilon was "well positioned to benefit from significant embedded margin growth from [its] long-term economic model by improving healthcare outcomes and effectively managing costs."   The Registration Statement similarly represented: "[Agilon's] long-term partnership with [its] anchor physician groups creates the potential for cost-efficient organic growth over time in the number of members on [its] platform as existing patients of [its] PCPs age into Medicare and as existing Medicare-eligible patients choose to convert from FFS to MA."

46.     The statements referenced in ¶¶43-45 above were inaccurate statements of material fact because they failed to disclose the following adverse facts which existed at the time of the IPO:

(a)     that Agilon's business model, purportedly focused on patient care rather than fee-for-service, was unable to provide the cost savings and the mitigation of medical expenses represented to investors;

(b)     that Agilon's purported historical cost savings portrayed to investors in connection with the IPO were short-term effects of the COVID-19 pandemic and not indicative of the cost controls and incentives ostensibly inherent in Agilon's business model; and

(c)     that, as a result of (a)-(b) above, Agilon suffered from a material, undisclosed risk of higher utilization and medical claims rates once the short-term effects of the COVID-19 pandemic waned and the providers in Agilon's network were poised to experience an upsurge in patient demand for medical services materially above the historical rate portrayed in the Registration Statement.

47.     Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

48.     The failure of the Registration Statement to disclose the true nature of Agilon's business model and the adverse utilization and cost trends being suffering by Agilon, as well as the attendant impact to Agilon's medical margin, adjusted EBITDA, ability to generate positive cash flows, and overall business and profitability, violated Item 303, because these undisclosed facts were known to defendants and would (and did) have an unfavorable impact on the Company's

sales, revenues, and income from continuing operations.  This failure also violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in Agilon securities speculative or risky.  Indeed, the boilerplate discussions of potential risks provided in the Registration Statement were themselves materially misleading, because they discussed potential future contingencies regarding potential variabilities in cost and claims rates, but, for example, failed to disclose that Agilon had ***already*** been negatively impacted by undisclosed adverse costs and rising medical expenses, which had materially adversely impacted Agilon's financial results and business prospects.

49.     Subsequent to the IPO, the price of Agilon stock fell precipitously in value.  By March 2024, the price of Agilon stock fell to less than $6 per share, well below the price at which Agilon stock had been sold to investors in the IPO, causing purchasers in the IPO to suffer financial losses and damages under federal securities laws.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

50.     The Class Period begins on April 15, 2021, which is the day after the Registration Statement was declared effective by the SEC and the first day Agilon shares were publicly traded in connection with the IPO.  On April 16, 2021, Agilon filed with the SEC the Prospectus, which incorporated and formed part of the Registration Statement that was signed by defendants Sell and Bensley, among others.  The Registration Statement contained the representations detailed in ¶¶43-45 above.

51.     On May 26, 2021, Agilon issued a release announcing its first quarter ended March 31, 2021 (the "1Q21 Release").  The release stated that Agilon had achieved a $52 million medical

margin and $4 million adjusted EBITDA for the first quarter, while sustaining a $14 million net loss.

52.     Also on May 26, 2021, Agilon filed with the SEC its first quarter 2021 quarterly report on Form 10-Q, which was signed by defendant Bensley and also certified by defendants Sell and Bensley as to the report's accuracy and completeness.  The Form 10-Q included the financial results provided in the 1Q21 Release.  The Form 10-Q also stated that as Agilon's "platform matures over time, we expect medical margin to increase in absolute dollars."

53.     On May 27, 2021, Agilon held a conference call to discuss its first quarter 2021 financial results, which was hosted by defendants Sell and Bensley.  During his prepared remarks, defendant Sell stated: "With our approach, all stakeholders are winning. . . .  Payers experience consistent growth and gross margins while enjoying higher patient quality scores and retention, and Medicare and local communities benefit through more sustainable primary care and effective management of health care costs."

54.     On August 4, 2021, Agilon issued a release announcing its second quarter ended June 30, 2021 (the "2Q21 Release").  The release stated that Agilon had achieved a $55 million medical margin and ($2 million) adjusted EBITDA for the quarter, while sustaining a $299 million net loss which reflected one-time increased costs from the IPO.

55.     Also on August 4, 2021, Agilon filed with the SEC its second quarter 2021 quarterly report on Form 10-Q, which was signed by defendant Bensley and also certified by defendants Sell and Bensley as to the report's accuracy and completeness.  The Form 10-Q included the financial results provided in the 2Q21 Release.  The Form 10-Q also stated that as Agilon's "platform matures over time, we expect medical margin to increase in absolute dollars."

56.     On August 5, 2021, Agilon held a conference call to discuss its second quarter 2021 financial results, which was hosted by defendants Sell and Bensley.  In response to an analyst question, defendant Sell stated: "I think we're pleased by where we're at for medical margin. . . . [O]bviously, new members always will come in at lower medical margins than more mature cohorts over time."

57.     On September 13, 2021, Agilon filed with the SEC the prospectus for the September 2021 SPO, which incorporated and formed part of the registration statement for the September 2021 SPO signed by defendants Sell and Bensley, among others (the "September 2021 Registration Statement").  The September 2021 Registration Statement contained substantially the same representations as those contained in the Registration Statement for the IPO detailed in ¶¶43-45 above.

58.     On October 28, 2021, Agilon issued a release announcing its third quarter ended September 30, 2021 (the "3Q21 Release").  The release stated that Agilon had achieved a $43 million medical margin and ($14 million) adjusted EBITDA for the quarter, while sustaining a $36 million net loss.

59.     Also on October 28, 2021, Agilon filed with the SEC its third quarter 2021 quarterly report on Form 10-Q, which was signed by defendant Bensley and also certified by defendants Sell and Bensley as to the report's accuracy and completeness.  The Form 10-Q included the financial results provided in the 3Q21 Release.  The Form 10-Q also stated that as Agilon's "platform matures over time, we expect medical margin to increase in absolute dollars."

60.     On October 29, 2021, Agilon held a conference call to discuss its third quarter 2021 financial results, which was hosted by defendants Sell and Bensley.  In his prepared remarks, defendant Sell stated: "We were again pleased with our performance, both in terms of growth and

medical margin.  Our results were especially encouraging given broader dynamics around medical costs and the Delta variant."  Defendant Sell continued: "Through the agilon platform, we leverage algorithms to better identify specific cohorts of patients or physicians, stratify where care should optimally be delivered within that network and deploy the clinical support alongside our partners to drive sustainably lower cost and improved quality."  Later, in response to an analyst question, defendant Sell stated: "And so most of the better-than-expected performance is based on lower medical costs."

61.      On March 3, 2022, Agilon issued a release announcing its fourth quarter and full year financial results for the year ended December 31, 2021 (the "FY21 Release").  The release stated that for fiscal 2021, Agilon had achieved a $182 million medical margin and ($39 million) adjusted EBITDA, while sustaining a $407 million net loss for the year.  The release quoted defendant Sell, who stated: "'Looking ahead to 2022, we expect to generate significant gains in profitability while maintaining strong growth in membership and revenue.'"

62.      Also on March 3, 2022, Agilon filed with the SEC its 2021 annual report on Form 10-K, which was signed by defendants Sell and Bensley (among others) who also certified as to the report's accuracy and completeness.  The Form 10-K included the financial results provided in the FY21 Release.  The Form 10-K also stated that as Agilon's "platform matures over time, we expect medical margin to increase in absolute dollars."

63.      On March 4, 2022, Agilon held a conference call to discuss its fourth quarter and full year 2021 financial results, which was hosted by defendants Sell and Bensley.  During his prepared remarks, defendant Sell claimed the Company's unique business model had placed it on a path to increased profitability, stating in pertinent part as follows:

> ***We have been able to deliver higher levels of membership growth while still generating significant gains in profitability.  And we expect to generate***

***positive adjusted EBITDA in 2022***.  Because of our focus on existing market capacity, local market scale and platform insights, we are transforming how health care is delivered across our markets, both in and outside of the primary care office, with increased primary care touch points and impactful programs like specialty referral and palliative care.  We believe all primary care physicians will need to change their business model over the next decade, shifting from a transaction, fee-for-service model to a value-based subscription model.  Ultimately, this will improve quality, lower costs and create better outcomes for our health care system.

64.     On May 5, 2022, Agilon issued a release announcing its first quarter ended March 31, 2022 (the "1Q22 Release").  The release stated that Agilon had achieved an $86 million medical margin and $12 million adjusted EBITDA for the first quarter, while achieving $1 million in net income.

65.     Also on May 5, 2022, Agilon filed with the SEC its first quarter 2022 quarterly report on Form 10-Q, which was signed by defendant Bensley and also certified by defendants Sell and Bensley as to the report's accuracy and completeness.  The Form 10-Q included the financial results provided in the 1Q22 Release.  The Form 10-Q also stated that as Agilon's "platform matures over time, we expect medical margin to increase in absolute dollars."

66.     That same day, Agilon held a conference call to discuss its first quarter 2022 financial results, which was hosted by defendants Sell and Bensley.  During his prepared remarks, defendant Sell stated: "The new primary care model we have created with our partners aligns physician outcomes with improvements in the quality, experience and cost of their senior patients care."  Defendant Sell continued: "Being first in a market, coupled with scale, allows agilon and our partners to shape the local evolution of value-based care and positively impact downstream specialty and facility costs."

67.     On August 4, 2022, Agilon issued a release announcing its second quarter ended June 30, 2022 (the "2Q22 Release").  The release stated that Agilon had achieved an $82 million

medical margin and $7 million adjusted EBITDA for the quarter, while sustaining a $21 million net loss.

68.     Also on August 4, 2022, Agilon filed with the SEC its second quarter 2022 quarterly report on Form 10-Q, which was signed by defendant Bensley and also certified by defendants Sell and Bensley as to the report's accuracy and completeness.  The Form 10-Q included the financial results provided in the 2Q22 Release.  The Form 10-Q also stated that as Agilon's "platform matures over time, we expect medical margin to increase in absolute dollars."

69.     That same day, Agilon held a conference call to discuss its second quarter 2022 financial results, which was hosted by defendants Sell and Bensley.  In his prepared remarks, defendant Sell stated: "The new primary care model we have created with our partners aligns physician outcomes with improvements in the quality, experience and cost of their senior patients total care."  Defendant Bensley added, "Growth in our platform support cost continues to trend well below our revenue growth and highlights the light overhead structure of our partnership model."

70.     On November 3, 2022, Agilon issued a release announcing its third quarter ended September 30, 2022 (the "3Q22 Release").  The release stated that Agilon had achieved a $76 million medical margin and ($5 million) adjusted EBITDA for the quarter, while sustaining a $31 million net loss.

71.     Also on November 3, 2022, Agilon filed with the SEC its third quarter 2022 quarterly report on Form 10-Q, which was signed by defendant Bensley and also certified by defendants Sell and Bensley as to the report's accuracy and completeness.  The Form 10-Q included the financial results provided in the 3Q22 Release.  The Form 10-Q also stated that as Agilon's "platform matures over time, we expect medical margin to increase in absolute dollars."

72.     That same day, Agilon held a conference call to discuss its third quarter 2022 financial results, which was hosted by defendants Sell and Bensley.  In his prepared remarks, defendant Bensley stated with respect to the Company's direct contracting program: "[W]e continue to outperform national benchmarks from a cost and quality standpoint."  Later, in response to an analyst question, defendant Sell stated: "But I think in general, we figure like – we feel like we're seeing an acceleration sooner for our year-1 markets in terms of the benefits of the high-touch model, and it's coming through in terms of better satisfaction, better health outcomes and ultimately lower costs and better margins overall."  Defendant Sell also added: "[W]e are beating national benchmarks in terms of utilization trend."

73.     Defendants' statements referenced in ¶¶50-72 above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts about Agilon's business, operations, and prospects, which were known to defendants or recklessly disregarded by them, as follows:

(a)     that Agilon's business model, purportedly focused on patient care rather than fee-for-service, was unable to provide the cost savings and the mitigation of medical expenses represented to investors;

(b)     that Agilon's purported historical cost savings portrayed to investors in connection with the IPO and the September 2021 SPO were short-term effects of the COVID-19 pandemic and not indicative of the cost controls and incentives ostensibly inherent in Agilon's business model; and

(c)     that, as a result of (a)-(b) above, Agilon suffered from a material, undisclosed risk of higher utilization and medical claims rates once the short-term effects of the COVID-19 pandemic waned and the providers in Agilon's network were poised to experience an

upsurge in patient demand for medical services, materially above the historical rate portrayed in the Registration Statement.

74.     On January 9, 2023, Agilon held an investor presentation at the JPMorgan Healthcare Conference hosted by defendant Sell.  During the presentation, defendant Sell provided Agilon's 2023 adjusted EBITDA guidance of $75 million to $90 million (compared to $4 million in 2022), which defendant Sell described as "another meaningful step up in profitability." Defendant Sell claimed that this increase in profitability would derive from the maturation of the Company's patient cohorts and increased platform efficiencies, stating in pertinent part as follows:

> To understand this phenomenon how an annual EBITDA ramp of plus $40 million in '22, plus $70 million to $80 million in 2023 gets created, you need to get underneath the composite view and understand how members mature across time. ***This cohort migration of members across time is one of the true powers in the financial model of agilon.  Our ability to create long-term member subscription economics that appreciate over time is super important for our physicians, for the communities, and it gets that flywheel turning faster and faster***.
>
> *             *             *
>
> Finally, ***there's platform support leverage.  We have an incredibly capital efficient model.  We've been able to reduce platform support costs in '22 from 7% to 5%, and in 2023, you will see another significant improvement***.

75.     On March 1, 2023, Agilon issued a release announcing its fourth quarter and full year financial results for the year ended December 31, 2022 (the "FY22 Release").  The release stated that for fiscal 2022, Agilon had achieved a $305 million medical margin and $4 million adjusted EBITDA, while sustaining a $107 million net loss for the year (compared to a $407 million net loss in 2021).  The release further stated: "Guidance for 2023 includes significant gains in Adjusted EBITDA to $75 million to $90 million while maintaining strong revenue and membership growth."  In addition, the release stated that Agilon was on track to achieve a $160 million to $170 million medical margin and $32 million to $37 million adjusted EBITDA in the

first quarter of 2023, and a $535 million to $560 million medical margin and $75 million to $90 million adjusted EBITDA for fiscal 2023.

76.     That same day, Agilon held a conference call to discuss its fourth quarter and full year 2022 financial results, which was hosted by defendants Sell and Bensley.  During his prepared remarks, defendant Sell claimed that Agilon was on track to achieve nearly $550 million in medical margin for 2023 because of the Company's healthcare model, which purportedly reduced wasteful spending, stating in pertinent part as follows:

> Our accelerating momentum in both new and current markets ***comes from our ability to drive meaningful reductions in wasteful health spending, generating a surplus that we call medical margin*** and reinvest roughly half of that surplus back into local primary care.  ***Our medical margin for 2023 is projected at nearly $550 million, making agilon and our partners an incredible catalyst for stabilizing and growing primary care nationally***.

77.     Defendant Sell further claimed that the maturation of the Company's member cohorts and increased operational leverage was driving sustained earnings growth, stating in pertinent part as follows:

> ***Turning to 2023, our guidance reflects the momentum in our business as membership, revenue, medical margin and adjusted EBITDA are all projected to grow even faster than they did last year***.
>
> ***Our adjusted EBITDA guidance of $75 million to $90 million reflects a year-over-year increase of approximately $78 million at the midpoint***, where we are sustaining 50% MA membership growth.  Just like in 2022, ***the inflection in our 2023 adjusted EBITDA is powered by our year 2-plus markets, which generate substantial operating leverage at the market and corporate level***.
>
> This step-change in earnings is being delivered while 44% of our membership is in year 1 or 2 markets versus 37% in 2022, ***highlighting the long-term embedded earnings being created.  But we continue to drive significant improvements in the current period***.
>
> These results also highlight the operating leverage inherent in setting up the infrastructure for full risk in a local market as ***the flow-through of incremental medical margin dollars to adjusted EBITDA is significant***.

> *The takeaway is that the maturation of our markets and members is accelerating our adjusted EBITDA gains in 2023 and beyond.*

78.     Also on March 1, 2023, Agilon filed with the SEC its 2022 annual report on Form 10-K, which was signed by defendants Sell and Bensley (among others) who also certified as to the report's accuracy and completeness.  The Form 10-K included the financial results provided in the FY22 Release.  The Form 10-K also stated that as Agilon's "platform matures over time, we expect medical margin to increase in absolute dollars."

79.     On March 8, 2023, defendant Bensley gave a presentation to investors regarding Agilon at the Cowen Health Care Conference.  The analyst hosting the call asked defendant Bensley to explain the "really significant pivot towards profitability" that the Company was claiming it was experiencing.  Defendant Bensley stated that the maturation of the Company's member cohorts and the superiority of its business model explained the improvements, stating in pertinent part as follows:

> [A]as we go into 2023 we guided the numbers at the midpoint of our guidance of $75 million to $90 million of adjusted EBITDA, *it's like another $80 million pickup.  So yes, we're definitely reflecting on that side*.
>
> The drivers of it are that – really the things that have driven our performance over the last few years continue to drive – in fact*, if anything we're driving it a little bit outside performance versus what we expected.  We continue to do tremendously well on that budget*.  So a big part of our movement year-over-year has been our ability to bring margin and membership . . . .
>
> *                *                *
>
> *The second thing is, I mean, we have done and we continue to do a really good job of – as those markets come on and as we secure them on the platform, being able to generate better overall quality of health care for our members, better overall health outcomes for our members and also just eliminating a lot of waste in the system in terms of driving cost out of the system*.
>
> *And that has resulted in a really nice maturation cohorts* for each of these markets as they kind of go on the platform for 1-year, 2-year, 3-year, 4-year (inaudible) on with the market sort of PMPM on the platform for over 5 years.  And really pleased what we saw in 2022, we just reported that at the end of the year,

those markets that were on the platform for 2 years plus are kind of excluding the year 1 markets, had like a 33% increase in Medical Margin PMPM basis, where we're already have like $124.

*But* each year, you can see the membership growth versus that medical margin growth, it comes just through in the numbers.  So if we had about a 45% increase in membership in 2022, our medical margin dollars have increased . . . 57%.  *So you're just seeing that member maturation flow through with medical margin continuing to grow at a faster rate than membership . . . type of numbers which are on the platform*.

\*     \*     \*

*And as we look forward to what we've guided for 2023 to get to the $80 million, you'll see that factor again*.  So we've guided to about a 50% increase in *membership*, but about an 8% increase in medical margin dollars.  So that's the same phenomena of those markets maturing on the platform and getting that positive growth with medical margin.

80.     Later during the conference, defendant Bensley stated that because of "all the things that we've seen over the last year" Agilon had "really, really high confidence in our trajectory against our long-term objectives," which included "around 800,000 members in 2026 and medical margin numbers on a PMPM basis in the mid-160s, platform support costs at or below 3% and EBITDA dollars up around that $600 million range."

81.     On March 30, 2023, Agilon held its annual Investor Day, which was hosted by defendants Sell and Bensley.  During his prepared remarks, defendant Sell highlighted that the Company was on track to achieve $550 million in medical margin for 2023, which he described as a "big number."  He continued: "It's up $250 million from 2022.  This number is incredibly important in terms of driving the step-up in adjusted EBITDA.  This year, it's north of $80 million of improvement from 2022 to 2023."

82.     During the Investor Day, defendant Bensley also focused on Agilon's purported improved profitability, stating in pertinent part as follows:

*Adjusted EBITDA at agilon is inflecting in a positive way.  That's driven by a – that's a function of our accelerating growth, our improving unit economics, our*

- 25 -

*maturing membership base as well as our continuing operating leverage. All of that gives us high confidence in our 2026 outlook for members, medical margin as well as overall profitability*. And we're doing this in a capital-light, high-returns model. We're well capitalized today, and *we expect to be generating positive cash flow in 2024 and beyond*.

*       *       *

So after a significant pickup of $43 million to get to positive adjusted EBITDA in 2022, *we're projecting an even bigger inflection of $80 million to get to our 2023 adjusted EBITDA guidance of $75 million to $90 million. That's really a function of the acceleration in member and revenue growth that we've seen since our first market went live in 2018 with a revenue CAGR of 50% over that time period.* That's going to inflect up then to over $4 billion of revenue in 2023. And when you consider all the members that we have live on the platform today, as well as all the members that we're implementing in this large class of 2024 that Veeral just talked about, we have clear line of sight to agilon as a $5.5 billion revenue company today.

*Medical margins growing at even a faster rate with a 60% CAGR over that same time period. And we expect medical margin dollars to inflect up to about $550 million in 2023. That's an 80% year-over-year increase from what we just reported for 2022. And I think that's a real hallmark of the agilon model, our ability to grow medical margin at the same time that we're growing membership*.

83.     Defendant Bensley continued by claiming that Agilon's medical margin had progressed "significant[ly], double digit or more in every single one of these member cohorts. . . . [T]hey're all progressing consistently. And we're expecting a pretty significant and positive inflection in 2023." Defendant Bensley claimed to have "great visibility in what the drivers of that inflection is," including the purported superiority of the Company's platform for tracking members. Defendant Bensley also represented that the fact that "adjusted EBITDA is inflecting, more members coming on to the market earlier, continued medical margin progression in a positive direction, great operating leverage, all of that gives us high confidence in our 2026 outlook of 850,000 MA members live on the platform, flowing through to over $600 million of adjusted EBITDA," as well as "positive cash flow in 2024 and beyond."

- 26 -

84.     Later, in response to an analyst question, defendant Bensley stated that Agilon was "much more confident now in our ability to drive medical margin improvement through claims, control through all of these clinical initiatives we put out there."  He then followed up by stating that the Company had "a lot of confidence in the upside case" of the Company's long-term guidance because of its "really clear line of sight" which gave the Company "a lot of confidence" in reaching its 2026 adjusted EBITDA outlook of more than $600 million.

85.     On May 9, 2023, Agilon issued a release announcing its first quarter financial results for the quarter ended March 31, 2023 (the "1Q23 Release").  The release stated that Agilon had revised its calculations of adjusted EBITDA to include geography entry costs (which had previously been excluded) to accord with recent SEC guidance.  Using the new calculations, the release stated that for the first quarter Agilon had achieved a $162 million medical margin and $24 million adjusted EBITDA, while sustaining a $16 million net loss for the quarter.  The release claimed that "[c]ontinued gains in profitability driven by strong performance across partner markets, inclusive of higher membership growth," had bolstered the Company's results.  The release further stated, using the revised calculations for adjusted EBITDA, that Agilon was on track to achieve a $138 million to $148 million medical margin and $2 million to $10 million adjusted EBITDA in the second quarter of 2023, and a $535 million to $560 million medical margin and ($3 million) to $25 million adjusted EBITDA for fiscal 2023.

86.     That same day, Agilon held a conference call to discuss its first quarter 2023 financial results, which was hosted by defendants Sell and Bensley.  During his prepared remarks, defendant Sell stated that Agilon's "profitability continues to inflect higher, with first quarter medical margin up 88% to $162 million and adjusted EBITDA more than tripling to $24 million." Defendant Sell later stated: "With our strong start to the year, we are maintaining the full year

adjusted EBITDA outlook we provided in March," which had been recalculated to factor in geographic entry costs.

87.    Defendant Bensley similarly highlighted the Company's medical margin results, which he claimed had significantly improved despite a hit from prior year revenue and claims adjustments, stating in pertinent part as follows:

> *Medical margin increased 88% year-over-year to $162 million during the first quarter*.  Medical margin increased both as a percentage of revenue and on a PMPM basis, even while accounting for the dilution of our membership growth. Membership margin was 14.3% of revenue during the first quarter compared to 13.2% last year, and medical margin PMPM increased 17% to $135 compared to $116 last year.
>
> *Medical margin benefited from the maturation of older markets and member cohorts which continue to offset dilution from our year 1 numbers*. Medical margins for our year 2 plus partners, which excludes the dilution from year 1 markets, increased 72% during the first quarter on a dollar basis and by 47% on a PMPM basis.  As we've discussed with you in the past, medical margin growth in our year 2 plus partners drives the majority of our adjusted EBITDA gains.

88.    When asked by an analyst to discuss the cost trends the Company was seeing, defendant Sell stated that "utilization was very much in line with what we would expect." Defendant Bensley similarly downplayed the quarter's "true-ups" as limited to a small number of old high-cost claims and "retro" members added to the network, which were all "within a manageable range" and did not signify any broader cost or utilization issues.  Later in the call, defendant Bensley further represented that as Agilon "move[s] through this year and we get more and more visibility to pay claims with our new payer partners and our new markets, by the time we get to Q4, you'll see that number moderate back down again as it has in the previous couple of years."

89.    Also on May 9, 2023, Agilon filed with the SEC its first quarter 2023 quarterly report on Form 10-Q, which was signed by defendant Bensley and also certified by defendants Sell and Bensley as to the report's accuracy and completeness.  The Form 10-Q included the

financial results provided in the 1Q23 Release.  The Form 10-Q also stated that as Agilon's "platform matures over time, we expect medical margin to increase in absolute dollars."

90.     On May 11, 2023, defendant Bensley gave a presentation regarding Agilon at the Bank of America Global Healthcare Conference.  When asked to comment on the Company's "very significant step-up in terms of medical margin PMPM," defendant Bensley responded: "[T]he numbers that we've seen coming through Q1, as we exited active numbers we've seen exiting 2022 and as we've now completed Q1, are very much right on track with what we expected across our markets cohorts for delivering 2023 and being ready to transition to 2024."

91.     On May 17, 2023, Agilon filed with the SEC the prospectus for the May 2023 SPO, which incorporated and formed part of the registration statement for the May 2023 SPO signed by defendants Sell and Bensley, among others (the "May 2023 Registration Statement").  The May 2023 Registration Statement claimed that Agilon's differentiated business model was "transforming healthcare by empowering [PCPs] to be the agents for change in the communities they serve."  The May 2023 Registration Statement represented that PCPs, in turn, were "best positioned to drive meaningful change in quality, cost, and patient experience when provided with the right infrastructure and payment model."

92.     The May 2023 Registration Statement further stated that Agilon provided such an infrastructure and payment model, which it described as reducing costs in pertinent part as follows:

> Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States.  Our purpose-built model provides the necessary capabilities, capital, and business model for existing physician groups to create a Medicare-centric, globally capitated line of business.  Our model operates by forming RBEs within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or global capitation arrangements).  The RBEs also contract with agilon to perform certain functions, and enter into long-

term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings *from successfully improving quality of care and reducing costs*.

      *Our business model is differentiated by its focus on existing community-based physician groups* and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network.   With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients.

93.    The May 2023 Registration Statement also claimed that Agilon had enjoyed healthy and improving medical margins on the Company's purported pathway to profitability and positive cash flows.  For fiscal 2022, the May 2023 Registration Statement stated that Agilon had achieved a $305 million medical margin and $4 million adjusted EBITDA, while sustaining a $107 million net loss for the year (compared to a $407 million net loss in 2021).  For the first quarter of 2023, the May 2023 Registration Statement stated that Agilon had achieved medical margin of $162 million, compared to $86 million in the first quarter of 2022; net income of $16 million, compared to $1 million in the first quarter of 2022; and adjusted EBITDA of $24 million, compared to $8 million in the first quarter 2022.  The May 2023 Registration Statement further stated that as Agilon's "platform matures over time, we expect medical margin to increase in absolute dollars."

94.    On June 7, 2023, defendants Sell and Bensley gave a presentation to investors regarding Agilon at the William Blair Growth Stock Conference.  During his prepared remarks, defendant Sell highlighted the Agilon care-focused business model, stating that "high-quality care is cost-effective care.  When you drive that type of quality, senior patients spend less time in the hospital.  They spend less time being readmitted into the hospital when they've been discharged and they spend less time entering the emergency department . . . ."  Defendant Sell further said

that Agilon's "performance is driving growth" and its "simple flywheel" improved the Company's

financial results over time.

95.     During the presentation, defendant Bensley represented that Agilon had

"tremendously high visibility to growth" and a "really, really strong visibility into exactly what's

happening."  Defendant Bensley said that Agilon had "tremendous embedded margins within each

of our markets" and as its "members and . . . partners mature on the agilon platform, margins grow

over time."  Defendant Bensley added: "So we have really great confidence and visibility in our

long-term value drivers.  And right now, our EBITDA has actually been inflecting positive year-

over-year."

96.     Defendant Bensley went on to elaborate on the purported cohort maturity and

superiority of the Agilon business model which was driving this purported earnings growth and

improved medical margins, stating in pertinent part as follows:

> Again, ***we're just seeing tremendous inflection in these rates***.  When you
> look at revenue growing at over 50% during this time period.  You can see between
> Q1 2023 this year that we just reported Q1 more like a 74% growth in medical
> margin and revenue, and that resulted in about an 88% increase quarter – year-over-
> year for the first quarter in medical margin dollars.  ***And you can see over time, our
> medical margin inflection has been tremendous at about a 60% CAGR or
> certainly in line with what our revenue – I'm sorry, with what our membership
> CAGR has been, and we expect this year to generate somewhere around $550
> million of medical margin***.

97.     Defendant Sell concluded the presentation by stating that Agilon "had a really

strong start this year."  He boasted: "I don't know many businesses that show an 88% step-up in

their main margin metric.  We're tripling our adjusted EBITDA year-over-year while we're

growing 60-plus percent."

98.     On August 3, 2023, Agilon issued a release announcing its second quarter financial

results for the quarter ended June 30, 2023 (the "2Q23 Release").  The release stated that for the

second quarter Agilon had achieved a $138 million medical margin and $10 million adjusted

- 31 -

EBITDA, while sustaining a $17 million net loss for the quarter.  The release stated that the "[d]urability of agilon[s'] partnership model [was] driving continued gains in profitability across Medicare Advantage and ACO REACH, inclusive of higher membership."  Quoted in the press release, defendant Sell echoed this sentiment, stating: "The durability and predictability of our partnership model enabled agilon to deliver strong performance during the second quarter and first half of 2023."  The release lowered the midpoint of Agilon's expected medical margin range for the year, but simultaneously *raised* the midpoint of the Company's expected adjusted EBITDA range, indicating that the Company was improving the profitability of its business model.  As a result, the release stated that Agilon was on track to achieve a $110 million to $125 million medical margin and ($8 million) to $0 adjusted EBITDA in the third quarter of 2023, and a $500 million to $535 million medical margin and $0 to $23 million adjusted EBITDA for fiscal 2023.

99.     That same day, Agilon held a conference call to discuss its second quarter 2023 financial results, which was hosted by defendants Sell and Bensley.  During his prepared remarks, defendant Sell stated:

> It should be noted that *our medical margin for MA included a net $7 million headwind from prior year claims and revenue, with about half of this flowing to adjusted EBITDA, making our profitability gains even more outsized on an underlying basis*.

*     *     *

> *[L]ooking forward from a guidance perspective, we have raised our membership revenue and adjusted EBITDA outlook for 2023*.

100.    Notably, defendant Sell addressed concerns that utilization rates were increasing across the industry which had arisen in connection with the provision of other healthcare providers' results.  Defendant Sell denied that these higher utilization rates were equally impacting Agilon, claiming that the Company's Total Care Model generated superior results, "insulated" the

Company from heightened utilization rates, and lessened medical claims among its customer base,

stating in pertinent part as follows:

> One theme I would like to drive home, given all of the speculation on utilization trends is that different models will yield different outcomes. *Agilon's model is distinctively different and more durable and predictable in driving cost and quality results compared to the broad fee-for-service system, which predominates across health care today*.

> *Let me highlight how we are producing such strong and predictable results and what drives our forward confidence in the business*. First, at agilon, we only take risk on patients that have an aligned long-term relationship with a PCP, who has both the resources to positively impact total cost and quality of care. We do not take risk on a broad set of patients in an unmanaged fee-for-service system. Our high-touch PCP led model allows partner physicians to actively manage the health of a discrete set of senior patients they have often known for decades.

> While our platform provides doctors with a consistent set of clinical resources like care managers, social workers and pharmacists, supported by technology and data insights. This allows our network to deliver consistent results across 500,000 attributed senior patients while our physician partners focus on the most complex 20% of patients that are driving 70% to 80% of total costs.

> *We believe this high-touch approach has prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization*.

101.    Defendant Sell further stated that the Company was actually running **ahead** of

internal expectations for utilization rates, bucking the industry trend. He stated in pertinent part

as follows:

> Second point on differentiation. *For our members, our year-to-date composite utilization trend is in line or better than our expectations. Year-to-date, we have driven very moderate ER and inpatient trends, with utilization flat to down in the mid-single-digit range, while primary care and outpatient utilization is up in the mid- to high single-digit range*. Given that we manage the full premium dollar in a total care relationship, we focus on the composite utilization trend and are comfortable and actively encouraging this mix shift.

> All of the clinical programs we shared with you at our Investor Day are oriented towards moving care closer to primary care while significantly reducing unnecessary ER and hospital utilization, and *they are tracking ahead of our expectations year-to-date*.

102.    Defendant Sell highlighted the Company's purported strong visibility into utilization rates to give investors further confidence in the Company's earnings estimates, stating in pertinent part as follows:

> Third, *our model has natural advantages in terms of leading indicators and visibility*.  From an operational standpoint, we are not just receivers of macro utilization trends.  Our teams are actively managing utilization on the ground every day.  This includes transition of care nurses, post-discharge follow-up visits and high-risk case managers.  Additionally, while MA claims data has some lag, our REACH claims data is very current through May, which is more than 90% complete.  *We have not seen any meaningful change in our expected cost trend, including outpatient procedures*.

103.    Finally, defendant Sell claimed that Agilon's profit sharing relationship with its PCPs generated positive patient outcomes which "buffers our financial results up and down" and, as a result, enabled Agilon to "guide to relatively tight ranges on medical margin and adjusted EBITDA and absorb puts and takes that may arise during a given period."

104.    Defendant Sell concluded by once again highlighting the purported superiority of Agilon's business model which had protected it from the higher cost environment affecting its competitors, stating in pertinent part as follows:

> *Ultimately, the durability and predictability of our model has enabled agilon to raise our adjusted EBITDA outlook during 2023 and set a strong foundation for 2024, even as some health plans with broad fee-for-service networks are seeing pockets of higher costs.  Our success in 2023 sets the table for strong performance in 2024, which should be another year of meaningful step-up in profitability*.
>
> As we have discussed previously, we operate in a very forward-looking model.  *And our visibility on the key levers for driving next year's performance is quite high*.
>
>         \*     \*     \*
>
> *Our confidence in 2024 is also bolstered by the combined strength of our run rate medical margin performance across MA and REACH in 2023*.  This is inclusive of the adjustment to our MA reserving approach, which was a proactive decision on our part and supported by the magnitude of the upside we are seeing in REACH.

- 34 -

> *On a combined basis, our underlying margins for MA and REACH are tracking slightly better than our expectations.*  This is obviously important as you think about the stepping off point for 2024.
>
> Finally, we are increasingly confident in our ability to manage the new risk adjustment model starting next year. . . .
>
> This is not something we had previously factored into our calculus on our ability to successfully manage the new risk model changes and this new information *further underscores our confidence in 2024 and beyond*.

105.    During his prepared remarks, defendant Bensley highlighted the actions that Agilon had taken to minimize prior claim developments and stated that "the strength and durability of [Agilon's] business model has enabled us to . . . improve our adjusted EBITDA outlook." Defendant Bensley further stated that Agilon's "updated outlook reflects our decision to strengthen our MA reserves in 2023 while embedding a range of scenarios on utilization and cost trend," but that these actions were "more than offset by stronger ACO REACH results and performance in our partner markets" and reflected a more conservative approach that "will support our performance in future years" and had allowed the Company to raise its membership, revenue, and adjusted EBITDA ranges for the year.

106.    Later in the call, defendant Sell was asked to provide clarity on the Company's visibility into cost trends.  In response, defendant Sell stated that the Company had incredibly high visibility and confidence in the claims and utilization rates shared with investors, stating in pertinent part as follows:

> *So I think our visibility is extremely strong, Stephen, and we have high confidence.  I think it's a function of our model, which is very different, right?* We are on the ground with PCPs every day, we are managing those most complex patients.  And so we're trying to better identify them and make sure the PCP and the care teams are aware of them and then make sure that they are engaged in our clinical programs.
>
> The data that we are receiving is in particular, focused on those highest cost settings like inpatient and ER.  And we put that together, *we're able to drive the*

*type of results that I talked about with inpatient down in the flat to down in the mid-single-digit range*.

> *From a claims perspective, to specifically answer your question, we are 90% complete on our May year-to-date reach claims.  And so there is incredibly high visibility*.  There is a lag on the MA claims, and Tim talked about the actions we're taking from a reserving perspective to protect ourselves on a go-forward basis.

> *But same markets, same doctors, same clinical programs, we're able to correlate these clinical programs and indicators with claims.  And so we feel like we have an incredible level of visibility on that*.  And I think the last thing I would just say is, *I think we've demonstrated that our model really stands out in higher utilization periods that broader fee-for-service markets are seeing*.

*     *     *

> Year-to-date, we have seen a 28% increase in the 2-day discharge visit back with the PCP versus where we were at last year.  It substantially reduced the readmit rate and that has substantially led to that inpatient trend, which is flat to down in that mid-single-digit range.  *So I think this is an area where we feel like we have incredible confidence.  The REACH comparison set gives us great visibility on the claims side that matches up with those operational indicators*.

107.    Also on August 3, 2023, Agilon filed with the SEC its second quarter 2023 quarterly report on Form 10-Q, which was signed by defendant Bensley and also certified by defendants Sell and Bensley as to the report's accuracy and completeness.  The Form 10-Q included the financial results provided in the 2Q23 Release.  The Form 10-Q also stated that as Agilon's "platform matures over time, we expect medical margin to increase in absolute dollars."

108.    On September 6, 2023, defendant Bensley gave a presentation to investors regarding Agilon at the Wells Fargo Healthcare Conference.  The host analyst began the presentation by asking about utilization trends that the Company was seeing.  Defendant Bensley claimed that Agilon's superior business model had led to significantly lower utilization rates which had purportedly increased the Company's profitability, stating in pertinent part as follows:

> I think you nailed it, though, by the way, the – obviously, there has been a lot of focus on utilization coming through the first half of the year.  And I think this current environment really gives us the opportunity to demonstrate the power of the

- 36 -

agilon model.  I know that sounds like it's simple, but ***our model is essentially designed to have a more efficient and really more consistent impact on utilization than probably just any other model out there, just certainly the normal fee-for-service environment***.

If you think about it, we're coming in with this overall partnership model that drives this tremendous alignment with the primary care physicians that we partner with to really work on driving outcome over time.  But the second thing is we're bringing this platform that allows the – or helps the primary care physician, both identify and bring the right care to their patients ***that then essentially over time does have that kind of leveling impact on utilization***.

***It also helps us drive utilization down below what the overall, I think, fee-for-service environment would be***. . . .

What we have much better continuity of care.  We're handling the conditions of our patients on a more ongoing basis and basically managing them on a proactive basis as they happen.  I think that has the impact of both lowering utilization as well as having more consistent utilization over time.  ***It may even have a positive impact on avoiding some of the pent-up demand issues that came out of post-COVID***.

Having said that, you can see the results in our numbers.  ***So when we came out and talked about Q2, we said that we're not only seeing – that we're beating kind of the average utilization on the inpatient side***.  And by the way, of course, inpatient is by far the largest part of our cost basis.  ***We're actually seeing an actual single-digit decrease in inpatient utilization against our population that we reported in Q2***.

Now at the same time, of course, we have been seeing pretty large increases in outpatient.  ***That's a smaller portion of the overall cost pie.  And so the inpatient decrease is more than offsetting that***.

109.    Defendants' statements referenced in ¶¶74-108 above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts about Agilon's business, operations, and prospects, which were known to defendants or recklessly disregarded by them, as follows:

(a)    that Agilon suffered from materially higher utilization and medical claims rates throughout the Class Period as compared to prior year periods as patients who had delayed

- 37 -

elective procedures and otherwise utilizing medical benefits during the COVID-19 pandemic sought treatment;

(b)     that Agilon's business model, purportedly focused on patient care rather than fee-for-service, had not insulated the Company from these adverse cost trends as claimed by defendants, and the Company was in fact suffering cost trends that were up to 3x higher in key areas like specialist costs, outpatient surgeries, and Part B drugs as compared to 2022;

(c)     that these material, adverse cost trends were not moderating, but in fact worsening as Agilon progressed through the year;

(d)     that, as a result of (a)-(c) above, Agilon had suffered tens of millions of dollars in excess costs related to patient supplemental benefits and over $60 million in excess costs related to the Company's core medical services that had not been disclosed to investors;

(e)     that Agilon had suffered tens of millions of dollars in prior year development claims that had not been revealed to investors;

(f)     that, as a result of (a)-(e) above, Agilon's historical medical margins and adjusted EBITDA had been artificially inflated and materially misrepresented to investors;

(g)     that, as a result of (a)-(f) above, Agilon's 2023 medical margin and adjusted EBITDA guidance, its 2024 cash flow guidance, and its 2026 long-term guidance was not achievable and lacked a reasonable basis in fact.

110.    Then, on November 2, 2023, Agilon issued a release announcing its third quarter financial results for the quarter ended September 30, 2023 (the "3Q23 Release").  The release revealed a significant deterioration in the Company's medical margins coming in at just $108 million for the quarter, far below analyst consensus estimates, due in part to $9 million in previously unreported prior year claims.  In addition, the release disclosed Agilon suffered ($6

million) in quarterly adjusted EBITDA, which also missed analyst estimates. The release sharply lowered Agilon's 2023 expected medical margins to a range of just $455 million to $470 million. On a related earnings call, Agilon executives revealed that the Company had suffered higher utilization rates earlier in the year (notwithstanding defendants' prior claims to the contrary), had already significantly drawn down the reserves the Company had set aside earlier in the year to cover increased costs, and was adding an additional $30 million to its reserves because of the potential for higher utilization trends to continue.

111.     As a result of this news, the price of Agilon common stock dropped from $16.89 per share when the market closed on November 2, 2023 to $14.66 per share on November 3, 2023, a 13% decline on abnormally heavy volume of nearly 17 million shares traded. However, because defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as detailed herein, the price of Agilon stock remained artificially inflated.

112.     The 3Q23 Release stated that Agilon was on track to achieve a $455 million to $470 million medical margin and $6 million to $18 million adjusted EBITDA for fiscal 2023.

113.     That same day, Agilon held a conference call to discuss its third quarter 2023 financial results, which was hosted by defendants Sell and Bensley. During the call, defendants dismissed the miss on medical margins as related to the Company's underperforming Hawaii business, which it had sold off recently, and data issues from a single payor that had been largely resolved. In his prepared remarks, defendant Sell reassured investors that "[a]ll of [Agilon's] key financial metrics were generally in line or above our guidance ranges, especially on an underlying basis," and the Company's "results continue to demonstrate the unique power of our model to

inflect profitability while driving significant growth." Defendant Sell continued in pertinent part as follows:

> *Adjusted for Hawaii, our partner market EBITDA was positive $6 million for the quarter, well above our outlook.  And it was even stronger on an underlying basis as our results included some net negative development from 2022.*  Our combined medical margin across MA partner markets and REACH was strong in the quarter, with MA generating $111 million and REACH generating $55 million.  *These results demonstrate the power of a PCP focusing on the most complex patients across their entire senior panel with differentiated information and care team resources.*

114.    Defendant Sell further stated that the Company's "more conservative reserving approach" was "intentionally reflected in [its] medical margin outlook for MA and will support [its] future performance in 2024," and the Company's "ability to execute against [its] adjusted EBITDA targets during 2023 and enhance [its] visibility to 2024 continues to reflect the strength and durability of [its] model."  Defendant Sell added: "We remain highly confident in the trajectory of our adjusted EBITDA inflection and expect to share an initial view in early January.  As we have discussed previously, we operate in a very forward-looking model, and our visibility into the key drivers for next year's performance are quite high."

115.    Referring to the Company's underperformance on its medical margins for the quarter, defendant Bensley stated that the "difference was primarily driven by performance in Hawaii" – which the Company had recently sold – and the "negative claims development this quarter was almost entirely isolated to system issues with a single payer related to supplemental benefit costs."  Defendant Bensley also reassured investors that the Company's increased reserves simply reflected a "more conservative reserving posture," rather than any fundamental deterioration in the business, and would "provide a strong foundation for future performance while still modestly raising our adjusted EBITDA guidance."

116.     In response to analyst questions, defendant Sell again denied that the Company was experiencing abnormal utilization trends, stating: "From a utilization perspective, composite utilization was in line with our overall expectations" and the temporary step up in utilizations had reverted to a "deceleration" and would be "flat through the end of the year."  Later in the call, defendant Sell stated that the increased reserves had taken any "issue around negative [prior year development] off the table" and "significantly mitigate the chance of any negative development into 2024."

117.     Defendant Bensley added that utilization trends had "greatly started to moderate in June" and "continued to moderate in early Q3 as well," which he claimed demonstrated the "strength of [Agilon's] model."  When asked how much of the reserve was attributable to increased utilization and how much to the potential for prior year negative developments, defendant Bensley responded: "[W]e've looked at the expense trend and tried to be appropriately conservative to try to make sure that we're preventing or at least minimizing the possibility of that happening again next year."  Defendant Bensley also reaffirmed that 2024 would be "kind of a transition year into positive free cash flow."

118.     Also on November 2, 2023, Agilon filed with the SEC its third quarter 2023 quarterly report on Form 10-Q, which was signed by defendant Bensley and also certified by defendants Sell and Bensley as to the report's accuracy and completeness.  The Form 10-Q included the financial results provided in the 3Q23 Release.  The Form 10-Q also stated that as Agilon's "platform matures over time, we expect medical margin to increase in absolute dollars."

119.     On November 14, 2023, defendants Sell and Bensley gave a presentation to investors regarding Agilon at the Wolfe Research Healthcare Conference.  During his prepared remarks, defendant Sell stated:

Today, we are reiterating our 2026 adjusted EBITDA target.  This is our guidance with Geo entry costs, which is north of $530 million. . . .  When you add back an expected geographic entry cost in '26 of $70 million, that nets to greater than $600 million, which is what we told you at our Investor Day back in March.

120.    Defendant Sell then walked investors through the adjustments that the Company had made to its medical margin estimates for 2023, stating that the walk down from a midpoint of $547 million in the original guidance to a midpoint of $463 million in the current guidance was due to $25 million in excess costs in the Hawaii market, $24 million in excess supplemental benefit costs, $13 million in core medical services costs, and $22 million in net prior year development costs.  Defendant Sell then reassured investors that adverse costs trends were "moderating, May at $19 million, June at $8 million, July at $3 million."  In addition, defendant Sell stated that the Company remained on track to meet its 2023 and 2026 guidance because, among other reasons: "We've doubled the company in the last couple of years and these members that are coming on the platform are starting at higher levels than what we've seen historically."

121.    Defendant Bensley similarly stated that "as we came through July and June, those same [utilization cost] categories continue to moderate – moderated back down."  He added: "We didn't see like a huge spike up in utilization that's continue[d] . . . all 3 of them moderated back down."  Later in the call, defendant Bensley was asked whether the reserve action taken by the Company to date included a "decent amount of conservatism."  Defendant Bensley responded that it did, ensuring that the Company was appropriately accrued and that there would be no more negative surprises heading into 2024, stating in pertinent part as follows:

> Yes.  I mean our objective is to say, hey, ***let's put enough into our outlook for the year to make sure that we're covering those – that potential that we could see actually higher utilization***.  So that's why we picked that right now, we picked that original 60 up to 90 when we saw what was actually coming through Q2.  So that's what gets you that kind of $10 million incremental versus the asset that we would have given to go.  But the idea is, yes, ***that we're going to end the year with that's going to be – put us in a very good position to be appropriately accrued for the year***.

> *You can look at it on a net basis, but there's no reason why we would*
> *expect to have.  We shouldn't be going into a year with a significant underaccrual*
> *of our cost stand-alone either*.

122.    Defendants' statements referenced in ¶¶112-121 above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts about Agilon's business, operations, and prospects, which were known to defendants or recklessly disregarded by them, as follows:

(a)     that Agilon suffered from materially higher utilization and medical claims rates throughout the Class Period as compared to prior year periods as patients who had delayed elective procedures and otherwise utilizing medical benefits during the COVID-19 pandemic sought treatment;

(b)     that Agilon's business model, purportedly focused on patient care rather than fee-for-service, had not insulated the Company from these adverse cost trends as claimed by defendants, and the Company was in fact suffering cost trends that were up to 3x higher in key areas like specialist costs, outpatient surgeries, and Part B drugs as compared to 2022;

(c)     that these material, adverse cost trends were not moderating, but in fact worsening as Agilon progressed through the year;

(d)     that, as a result of (a)-(c) above, Agilon had suffered tens of millions of dollars in excess costs related to patient supplemental benefits and over $100 million in excess costs related to the Company's core medical services that had not been disclosed to investors;

(e)     that Agilon had suffered tens of millions of dollars in prior year development claims that had not been revealed to investors;

(f)     that, as a result of (a)-(e) above, Agilon's historical medical margins and adjusted EBITDA had been artificially inflated and materially misrepresented to investors;

- 43 -

(g)     that, as a result of (a)-(f) above, Agilon's revised 2023 medical margin and adjusted EBITDA guidance, its 2024 cash flow guidance, and its 2026 long-term guidance was not achievable and lacked a reasonable basis in fact.

123.    The failure of Agilon's periodic SEC filings during the Class Period to disclose the true nature of Agilon's business model and the adverse utilization and cost trends being suffering by Agilon, as well as the attendant impact to Agilon's medical margin, adjusted EBITDA, ability to generate positive cash flows, and overall business and profitability, also violated Item 303, because these undisclosed facts were known to defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.  In addition, the failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in Agilon securities speculative or risky.  Indeed, the boilerplate discussions of potential risks provided by defendants during the Class Period were themselves materially misleading, because they discussed potential future contingencies regarding potential variabilities in cost and claims rates, but failed to disclose that Agilon had *already* been negatively impacted by tens of millions of dollars' worth of undisclosed adverse costs, which had materially adversely impacted Agilon's financial results and business prospects.

124.    Then, on January 5, 2024, Agilon issued a press release revealing that the Company had suffered dramatically higher prior medical expenses than previously revealed and, as a result, the Company was lowering its 2023 expected medical margin to a range of $340 million to $360 million, or approximately $110 million (24%) below the already substantially reduced guidance and $200 million (36%) below the Company's original guidance.  The release also stated Agilon's adjusted EBITDA had fallen to a range of ($69 million) to ($55 million) in 2023.  The release

withdrew Agilon's 2026 guidance, which had been confidently reaffirmed by defendants only a month-and-a-half previously, and provided a dismal 2024 outlook which included just $560 million to $600 million in medical margin and an adjusted EBITDA range of $40 million to $70 million.  The release acknowledged that:

> During 2023, agilon health experienced an increase in medical expenses attributable to higher-than-expected specialist visits, Part B drugs, outpatient surgeries, and supplemental benefits, partially offset by lower hospital medical admissions.  While a number of programs have been launched to improve visibility, balance risk-sharing and enhance predictability of results, management has assumed higher costs will continue into 2024.

125.    Separately, Agilon announced that defendant Bensley would be stepping down as CFO of the Company.

126.    During a related earnings call held that same day, defendant Sell admitted that the Company had failed to include "elevated cost trends" in the forecast provided to investors, as well as the "magnitude and source of the utilization shifts."  Rather than the industry-leading utilization trends that defendants had claimed throughout the Class Period and held up as an example of the validity of Agilon's business model, defendant Sell stated that the Company was in fact suffering "cost trends that were 2 to 3x higher [than] what we had seen in 2022 in key areas like specialist costs, outpatient surgeries and Part B drugs."  Defendant Sell also acknowledged that the increased utilizations, which would "persist through 2024," were due to a "backlog of pent-up demand from COVID."  Defendant Bensley, meanwhile, admitted that the Company was not on track to generate positive cash flow in 2024.

127.    As a result of this news, the price of Agilon common stock dropped from $12.08 per share when the market closed on January 4, 2024 to $8.63 per share on January 5, 2024, a nearly 29% decline on abnormally heavy volume of nearly 37 million shares traded.  However, because defendants failed to disclose the full truth and continued to make materially false and

misleading statements and omissions, as detailed herein, the price of Agilon stock remained artificially inflated.   Indeed, defendants' statements in ¶¶124 and 126, above, materially misrepresented the true scope of the problems regarding the Company's medical margin, medical expenses, utilization rates, prior year adverse costs, profitability, earnings, and growth trajectory.

128.    On February 27, 2024, Agilon issued a press release revealing that the Company's medical costs and utilization rates were even higher than the already disappointing results previously represented.  Agilon disclosed that its 2023 medical margin had in fact come in at just $299 million for the year – far lower than the already disappointing range of $340 million to $360 million provided just a few weeks prior.  The Company also revealed an additional $38 million in net costs from the fourth quarter and $13 million in costs attributable to prior periods.   The Company further revealed a $263 million net loss for 2023 and a ***negative $95 million*** adjusted EBITDA for the year – a far cry from the "meaningful step up in profitability" to a potential $90 million adjusted EBITDA ***gain*** originally claimed by defendants during the Class Period.  The Company also slashed its 2024 medical margin guidance by 27% at the midpoint to a range of $400 million to $450 million and its 2024 adjusted EBITDA guidance from a $40 million to $60 million ***gain*** to a $15 million to $60 million ***loss***.

129.    As a result of this news, the price of Agilon common stock dropped from $6.48 per share when the market closed on February 27, 2024 to $6.04 per share on March 1, 2024, a 7% decline on abnormally heavy volume of a three-day period.  In subsequent days, the price of Agilon stock continued to decline, falling to a low of just $5.66 per share on March 6, 2024, more than ***85% below*** the Class Period high.

130.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of Agilon common stock, plaintiff and other Class members have suffered significant losses and economic damages under the federal securities laws.

## ADDITIONAL SCIENTER ALLEGATIONS

131.    As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Agilon, and their control over and/or receipt and/or modification of Agilon's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

132.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the 1934 Act Individual Defendants.

133.    The 1934 Act Individual Defendants, because of their positions with Agilon, controlled the contents of Agilon's public statements during the Class Period.  The 1934 Act Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, non-public information, the 1934 Act Individual Defendants knew or recklessly disregarded that

the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. Indeed, the specific undisclosed issues involved critical information for investors that the 1934 Act Individual Defendants held themselves out as most knowledgeable about during quarterly conference calls and the metrics were closely tracked by the 1934 Act Individual Defendants.  For example, throughout the Class Period, the 1934 Act Individual Defendants claimed to have "great visibility"; "tremendously high visibility to growth"; "really great confidence and visibility in our long-term value drivers"; "really, really strong visibility into exactly what's happening"; "extremely strong" visibility; "incredibly high visibility"; "an incredible level of visibility"; and "high confidence" and "incredible confidence" regarding the false and misleading information they provided to investors, as detailed herein.  As a result, each of the 1934 Act Individual Defendants was responsible for the accuracy of Agilon's corporate statements during the Class Period and was, therefore, responsible and liable for the representations contained therein and knowingly, or at the very least recklessly, disseminated the material misrepresentations detailed herein.

134.    The scienter of defendants is further underscored by the certifications of defendants Sell and Bensley mandated by the Sarbanes-Oxley Act of 2002, filed during the Class Period, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Agilon was made known to them and that the Company's disclosure-related controls were operating effectively.

135.    Defendants had the motive and opportunity to commit fraud, causing Agilon to conduct three registered stock offerings during the Class Period in which more than $3.7 billion was raised from public investors from the sale of Agilon stock: (i) the IPO; (ii) the September 2021

SPO (in which defendant Sell personally participated, selling $2.9 million worth of Agilon stock); and (iii) the May 2023 SPO.  In addition, defendants Sells and Bensley were beholden to CD&R, who had provided them with their executive positions and who controlled the Company during the Class Period, including the Chairman of the Board position and several additional Board seats. The 1934 Act Individual Defendants helped facilitate CD&R's sale of over $2.7 billion worth of Agilon stock during the Class Period at artificially inflated prices as high as $30 per share, which has subsequently fallen more than 80% to less than $6 per share after the truth was revealed at the end of the Class Period.  Agilon and the 1934 Act Individual Defendants also caused Agilon to purchase 9.6 million shares in connection with the May 2023 SPO for approximately $200 million, providing further price support to the shares sold in the offering, further demonstrating their complicity in allowing CD&R to sell nearly $2 billion worth of Agilon stock at artificially inflated prices in that offering.

136.    Notably, multiple executives left Agilon during the Class Period or shortly thereafter, further bolstering an already compelling inference of scienter.  For example, defendant Bensley announced his sudden retirement from Agilon soon after the SPO was completed and the Company disclosed the truth regarding the adverse cost trends detailed herein.  In addition, in August 2023 Agilon announced that Priscilla Kasenchak, the Company's CAO, was leaving the Company, only about one year after she had assumed the position.  On February 8, 2024, Agilon similarly announced that Benjamin Kornitzer was transitioning out of his role as the Company's Chief Medical Officer.

## LOSS CAUSATION

137.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Agilon common stock and operated as a fraud or deceit on Class Period purchasers of Agilon common stock by

failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Agilon common stock declined significantly as the prior artificial inflation came out of the stock's price.

138.    As a result of their purchases of Agilon common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Agilon common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $44.83 per share on June 18, 2021.

139.    By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of Agilon's business, financial results, risks, and future financial prospects.  When the truth about the Company was revealed to the market, the price of Agilon common stock fell significantly, dropping to a low of $5.73 per share on March 1, 2024, and has continued to fall thereafter, removing the inflation therefrom and causing economic loss to investors who had purchased Agilon common stock during the Class Period.

140.    The decline in the price of Agilon common stock after the corrective disclosures came to light was a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in Agilon common stock negates any inference that the losses suffered by plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

141.    The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Agilon

common stock and the subsequent significant declines in the value of Agilon common stock when

defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF THE PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET

142.    At all relevant times, the market for Agilon common stock was an efficient market

for the following reasons, among others:

(a)     Agilon common stock met the requirements for listing and was listed and

actively traded on the NYSE, a highly efficient, national stock market;

(b)     as a regulated issuer, Agilon filed periodic public reports with the SEC;

(c)     Agilon regularly communicated with public investors via established

market communication mechanisms, including the regular dissemination of press releases on the

national circuits of major newswire services and other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services; and

(d)     Agilon was followed by securities analysts employed by major brokerage

firms who wrote reports that were distributed to the sales force and certain customers of their

respective brokerage firms.  Each of these reports was publicly available and entered the public

marketplace.

143.    As a result of the foregoing, the market for Agilon common stock promptly digested

current information regarding Agilon from all publicly available sources and reflected such

information in the price of the stock.  Under these circumstances, all purchasers of Agilon common

stock during the Class Period suffered similar injury through their purchases of Agilon common

stock at artificially inflated prices and a presumption of reliance applies.

144.    A Class-wide presumption of reliance is also appropriate in this action under the

Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because

the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions.  Because this action involves defendants' failure to disclose material, adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

<strong>NO SAFE HARBOR</strong>

145.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint.  Many of the specific statements pled herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Agilon who knew that those statements were false when made.

## COUNT I

### For Violation of §11 of the 1933 Act
### Against Agilon, the 1933 Act Individual Defendants,
### and the Underwriter Defendants

146.    Plaintiff incorporates only ¶¶1-49 above for purposes of this Count.  This Count does not sound in fraud and plaintiff expressly disavows any averment of fraud for purposes of this Count.

147.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

148.    Defendant Agilon is strictly liable to plaintiff and the Class for the misstatements and omissions contained in the Registration Statement.

149.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement that are herein alleged to be materially false and misleading were true and without omissions of any material facts and were not misleading.

150.    By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

151.    Plaintiff acquired Agilon common stock pursuant and traceable to the IPO as detailed herein.

152.    Plaintiff and the Class have sustained damages.  The value of the Agilon common stock issued in the IPO has declined substantially subsequent to and due to defendants' violations.

153.    At the time of their purchases of Agilon common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than

one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public.

## COUNT II

### For Violation of §15 of the 1933 Act
### Against the 1933 Act Individual Defendants, Agilon, and CD&R

154.    Plaintiff incorporates only ¶¶1-49 and 146-153 above for purposes of this Count. This Count does not sound in fraud and Plaintiff expressly disavows any averment of fraud for purposes of this Count.

155.    The 1933 Act Individual Defendants acted as controlling persons of Agilon within the meaning of §15 of the 1933 Act.  By reason of their positions with the Company, and their ownership of Agilon stock, the 1933 Act Individual Defendants had the power and authority to cause Agilon to engage in the wrongful conduct complained of herein.  CD&R controlled Agilon and the 1933 Act Individual Defendants for the reasons detailed herein, including its ownership of Agilon voting stock, ability to appoint members to the Board (including the Chairman), influence over Agilon management, historical relationship with the Company, and the various agreements that CD&R had caused the Company to enter into with it.  Agilon controlled the 1933 Act Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §15 of the 1933 Act.

## COUNT III

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Promulgated Thereunder
### Against Agilon and the 1934 Act Individual Defendants

156.    Plaintiff incorporates only ¶¶1-145 above for purposes of this Count.

157. During the Class Period, the defendants named herein disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

158. The defendants named herein violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Agilon common stock during the Class Period.

159. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Agilon common stock.  Plaintiff and the Class would not have purchased Agilon common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

160. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Agilon common stock during the Class Period.

**COUNT IV**

**For Violation of §20(a) of the 1934 Act**
**Against Agilon, the 1934 Act Individual Defendants, and CD&R**

161.    Plaintiff incorporates only ¶¶1-145 and 156-160 above for purposes of this Count.

162.    The 1934 Act Individual Defendants acted as controlling persons of Agilon within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Agilon stock, the 1934 Act Individual Defendants had the power and authority to cause Agilon to engage in the wrongful conduct complained of herein.  CD&R controlled Agilon and the 1934 Act Individual Defendants for the reasons detailed herein, including its ownership of Agilon voting stock, ability to appoint members to the Board (including the Chairman), influence over Agilon management, historical relationship with the Company, and the various agreements that CD&R had caused the Company to enter into with it.  Agilon controlled the 1934 Act Individual Defendants and all of its employees.  Each of these defendants were also culpable participants in the fraudulent scheme for the reasons alleged herein.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:  April 2, 2024                              ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
                                                  SAMUEL H. RUDMAN


                                               *s/ Samuel H. Rudman*
                                                  SAMUEL H. RUDMAN

                                               58 South Service Road, Suite 200
                                               Melville, NY 11747
                                               Telephone:  631/367-7100
                                               631/367-1173 (fax)
                                               srudman@rgrdlaw.com

                                               ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
                                               BRIAN E. COCHRAN
                                               655 West Broadway, Suite 1900
                                               San Diego, CA  92101-8498
                                               Telephone:  619/231-1058
                                               619/231-7423 (fax)
                                               bcochran@rgrdlaw.com

                                               Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
### PURSUANT TO FEDERAL SECURITIES LAWS

INDIANA PUBLIC RETIREMENT SYSTEM ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      (a)      Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

> *McLeod v. InnovAge Holding Corp.*, No. 1:21-cv-02770 (D. Colo.)
> *Ray v. StoneCo Ltd.*, No. 1:21-cv-09620 (S.D.N.Y.)
> *Homyk v. ChemoCentryx, Inc.*, No. 3:21-cv-03343 (N.D. Cal.)
> *Alich v. Opendoor Technologies Inc.*, No. 2:22-cv-01717 (D. Ariz.)
> *Das v. Unity Software, Inc.*, No. 3:22-cv-03962 (N.D. Cal.)
> *Woldanski v. TuSimple Holdings, Inc.*, No. 1:22-cv-09625 (S.D.N.Y.)
> *In re Silvergate Capital Corp. Sec. Litig.*, No. 3:22-cv-01936 (S.D. Cal.)
> *Henry v. Futu Holdings Limited*, No. 2:23-cv-03222 (D.N.J.)

(b)      Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

> *City of Hialeah Employees' Retirement System v. Peloton Interactive, Inc.*, No. 1:21-cv-09582 (S.D.N.Y.)
> *Crews v. Rivian Automotive, Inc.*, No. 2:22-cv-01524 (C.D. Cal.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this <u>27th</u> day of March, 2024.

INDIANA PUBLIC RETIREMENT SYSTEM

By: _____

Jeffrey M. Gill, Chief Legal and Compliance Officer

- 2 -

AGILON

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 06/25/2021 | 280 | $39.40 |
| 06/25/2021 | 7,350 | $39.40 |
| 09/17/2021 | 2,560 | $29.01 |
| 12/17/2021 | 140 | $23.33 |
| 12/17/2021 | 14,100 | $23.33 |
| 03/18/2022 | 10 | $23.50 |
| 03/18/2022 | 236 | $23.50 |
| 05/17/2022 | 172 | $19.53 |
| 06/24/2022 | 1,530 | $21.98 |
| 10/19/2022 | 500 | $19.71 |
| 12/16/2022 | 450 | $17.23 |
| 12/19/2022 | 140 | $16.77 |
| 03/17/2023 | 490 | $26.70 |
| 03/27/2023 | 14,678 | $28.72 |
| 03/28/2023 | 3,511 | $28.23 |
| 03/29/2023 | 1,284 | $27.06 |
| 03/30/2023 | 188 | $23.56 |
| 03/31/2023 | 267 | $23.63 |
| 04/03/2023 | 180 | $24.71 |
| 04/04/2023 | 221 | $24.89 |
| 06/08/2023 | 10,340 | $21.02 |
| 06/16/2023 | 440 | $17.36 |
| 06/16/2023 | 8,500 | $17.36 |
| 06/23/2023 | 880 | $17.09 |
| 07/20/2023 | 600 | $17.96 |
| 09/15/2023 | 2,680 | $18.75 |
| 09/15/2023 | 2,900 | $18.75 |
| 10/17/2023 | 580 | $19.80 |
| 10/17/2023 | 620 | $19.80 |
| 12/15/2023 | 1,580 | $13.08 |
| 12/15/2023 | 1,960 | $13.08 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 08/25/2021 | 230 | $36.00 |
| 07/11/2023 | 3,350 | $17.34 |
| 01/25/2024 | 5,880 | $5.80 |

Prices listed are rounded to two decimal places.